# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| MARK AUSTIN, | : | CIVIL ACTION |
| --- | --- | --- |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BLOOMIN' BRANDS, INC., et al., | : | |
| Defendants. | : | No. 16-6509 |

## MEMORANDUM OPINION

**Timothy R. Rice**                                                                                                             **August 30, 2017**
**U.S. Magistrate Judge**

      Plaintiff Mark Austin alleges that Defendants Bloomin' Brands, Inc. and OS Restaurant Services, LLC, as owners of the Bonefish Grill restaurant in Newtown Square, Pennsylvania (collectively, "Bonefish"), engaged in sex discrimination, race discrimination, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq. Bonefish seeks summary judgment.

      Bonefish's motion is granted in part and denied in part. No reasonable jury could find that the behavior of Austin's co-workers among themselves, which ranged from sophomoric and childish to sexually suggestive, crude, and offensive, originated "because of" Austin's sex or race. A reasonable jury, however, could find Bonefish retaliated against Austin by allowing the harassing behavior to intensify and target Austin because he had complained. Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67 (1986).

### I.    Legal Standard

      Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidence and any inferences from the evidence must be viewed in the light most favorable to the

non-moving party.  See Ray v. Warren, 626 F.2d 170, 173 (3d Cir. 2010).  If reasonable minds could conclude that there are sufficient facts to support a plaintiff's claims, summary judgment should be denied.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  It should be granted if no "reasonable jury could return a verdict for the nonmoving party," based on the evidentiary record.  Reedy v. Evanson, 615 F.3d 197, 210 (3d Cir. 2010).

## II. Facts Most Favorable to Austin

Austin began working as a saute cook at Bonefish in April 2015.  Pl.'s Counter-Statement of Facts (doc. 32-3) ("Pl. C.S.") ¶ 3; Def. St. of Undisputed Facts (doc. 29-2) ("Def. St.") ¶ 1.  Kevin Rothery was the managing partner.  Pl. C.S. ¶ 5; Def. St. ¶ 3.  Rothery's Joint Venture Partner was Shaina Nestor at the beginning of Austin's employment, and Michael McMann as of approximately December 2015.  Pl. C.S. ¶ 6-7; Def. St. ¶ 4.  Other supervisors were Bill Stellato, Robin Wright, Felicia Jilek, and Jeff Season.  Pl. C.S. ¶ 5; Def. St. ¶ 3.  Austin and Darius James were the only African-Americans working full-time in the kitchen. [1]  Pl. C.S. ¶ 8-9.  The other eight kitchen workers were Hispanic.  Id.

The company's harassment policy was not regularly provided to kitchen staff upon hiring.  Pl. C.S. at ¶¶ 15-19.  Immediately upon commencing his employment, Austin witnessed behavior by the Hispanic kitchen staff that violated Bonefish's sexual harassment policy.  Id. ¶ 21.  The kitchen staff would rub, pinch, or smack one another's backsides as they moved past one another, massage one another's shoulders, and put their arms around one another.  Austin Dep. at 85-86.  Austin testified there "wasn't a day [he] worked" at Bonefish that the touching did not happen.  Id. at 99.

---

[1]   James started working at Bonefish after Austin and corroborated Austin's testimony that they were the only two African-American kitchen workers.  James Dep. at 9.

2

There were also multiple communication issues between Austin and his Hispanic co-workers, who would refuse to tell him in English which food he needed to plate, and ignore his English-language requests for prep material. Id. at 79-81. Austin regularly reported the communication issues to Rothery, from the time he began working in April 2015 through September 2015, without resolution or improvement. Austin Dep. at 86.

In the summer of 2015, Austin and James verbally complained to Rothery about their colleagues' inappropriate touching, alleging that they felt sexually harassed. Pl. C.S. ¶ 42; Austin Dep. at 115, 130; James Dep. at 25, 37. Rothery told Austin he would "talk to the guys" about the harassment. Austin Dep. at 130. After Austin's complaint, his co-workers' behavior worsened and they began to target him. Pl. C.S. ¶ 46. His co-workers would "look at [Austin] and smile" while, for example, putting their hands into one another's pants. Austin Dep. at 108. Austin next made a written complaint in September 2015, and repeated his complaints six times to various managers. Id. He found, however, that "[t]he more [he] complained, the more vulgar [the kitchen staff] would get." Id.

The sexual touching became even more frequent. Austin Dep. at 256-57. Austin estimated his colleagues would mimic oral sex with one another twice per week, and anal sex "regularly." Id. at 103-04. One co-worker would put his hands into another's pants "fairly often," and another would do the same "weekly," id. at 105, and they would all "grab" or "touch" one another every day, id. at 110. He explained how his co-workers taunted and targeted him: "while [the co-worker] would have somebody's hip and be thrusting them, he'll be looking at me smiling while we're working. . . . it's like they're waiting for me to notice it." Id. at 113. Rothery was present while the employees mimicked sexual acts and regularly witnessed the objectionable activity. Pl. C.S. ¶ 29-30.

3

Austin also cited two incidents he believed demonstrated Rothery's racial bias. Austin Dep. at 121. Once, Rothery asked James to impersonate an African-American customer who was calling the hostess to complain about being seated in the corner. Pl. C.S. ¶¶ 37-39. Rothery laughed while the call was made (the "James impersonation call"). Id. ¶¶ 40-41. Another time, Rothery joked about being surprised that a Caucasian co-worker had African-American friends (the "joke about interracial friendship"). Austin Dep. at 121.

In September 2015, Austin wrote a letter to Rothery complaining about a number of issues, including the kitchen staff's inappropriate "sexual games," and suggested that Rothery condoned the conduct as shown by the James impersonation call incident. Pl. C.S., Def. C.S., ¶ 50; Ex. 3 at P27. Rothery did not appropriately follow up on Austin's written complaint. Pl. C.S. ¶ 53. Rothery was not disciplined for this failure until March 29, 2016, the same day Austin resigned. Ex. 20 to Pl. Resp.

In October or November 2015, one of the kitchen staff used a kitchen tong to pinch James's nipple. Pl. C.S. ¶ 58; Austin Dep. 101-02. Austin complained to Rothery, who failed to appropriately address the incident. Pl. C.S. at ¶¶ 62-63; Austin Dep. at 159. Instead, Rothery placed the employee who had pinched James next to Austin in the kitchen and denied Austin's request for a schedule change.[2] Pl. C.S. at ¶ 66. Located next to "the biggest aggressor in the store as far as harassment goes," Austin began complaining to Rothery daily about his co-workers' sexual harassment. Austin Dep. at 256. He also told Rothery his fear that, now that he was in even closer proximity – two feet away – he would be touched inappropriately. Austin Dep. at 256-57. When he would bend over and a colleague would "brush past" his rear, Austin "never knew how to take it." Id. at 257.

---

[2] Bonefish admits these actions were taken but contends it had valid business reasons for denying the schedule change. Def. C.S. ¶ 66.

4

Austin also complained to the other managers. Pl. C.S. at ¶ 71. One manager, Robin Wright, could see that the continued harassment was affecting Austin, and asked him repeatedly what was wrong. Austin Dep. at 161. Austin finally explained to Wright, who did not document the conversation until three weeks after it had taken place, that he felt harassed, stressed, and frustrated by his colleagues' behavior. Id. at 161-63. Wright laughed.[3] Id. at 162. Austin's complaint to Wright was never investigated.[4] Pl. C.S. at ¶¶ 74-75.

On March 19, 2016, Rothery warned Austin to "get engaged" or go home. Pl. C.S., Def. C.S. at ¶ 81. Austin went home. Id.

On March 20, 2016, Austin asked to speak with McMann, Rothery's superior. Id. at ¶ 82. Austin and McMann met the next day and Austin complained about the alleged touching and sexual pantomime. Id. at ¶ 83. This was the first time McMann was made aware of Austin's complaints. Id. at ¶ 86. McMann investigated the complaint and advised Austin that many of his co-workers had admitted their behavior. Austin Dep. at 168. On March 22, 2016, Austin returned to Bonefish and worked a shift during which McMann worked as manager. Austin Dep. at 168-69.

During Austin's next shift, on March 24, 2016, one of his co-workers put his hands inside another co-worker's pants. Austin Dep. at 169. Austin left his post in the kitchen and reported the behavior to Rothery, who reprimanded the employees and advised McMann. Austin Dep. at 169. At McMann's direction, Rothery asked Austin to write a statement describing the behavior and gave him the rest of the night off from work. Id. at 170.

---

[3] According to Wright's notes, she spoke with the other managers the next day and followed up by having several conversations with the kitchen staff. Austin Dep. at 163-64.

[4] Bonefish admits that one complaint was made to Wright, but disputes the date and whether Wright appropriately handled it. Def. C.S. ¶¶ 74-75.

On March 25, 2016, however, McMann told Austin that the company was finished addressing his complaints and that Austin would no longer be permitted to leave his work station when he witnessed offensive behavior. Pl. C.S. at ¶ 108; Austin Dep. at 172. McMann said such offensive behavior would warrant discipline only if it was observed by a manager. Austin Dep. at 172. Otherwise, Austin would have to deal with the offensive behavior or quit. Pl. C.S. at ¶ 109; Austin Dep. at 172. Austin said he was not comfortable coming back to work if the behavior was going to continue. Pl. C.S., Def. C.S. ¶ 110. McMann then told Austin that he had received a complaint about Austin's behavior, and questioned Austin about an alleged inappropriate conversation between Austin and James about a female co-worker. Austin Dep. at 172.

On March 26 and 27, 2016, Rothery and Wright met with kitchen employees. Pl. C.S. ¶ 113. Although James testified the employees were instructed no additional touching could occur at work, most of the offending co-workers were not shown a copy of the harassment policy, Ex. 32 to Pl. C.S., Reyes Dep. at 7 (Wright never spoke about the harassment policy), and some did not understand that sexual harassment was the focus of the meeting. Pl. C.S. ¶ 112-13; Ex. 32 to Pl. C.S., Rivera Dep. at 8-9 (kitchen worker remembered Wright saying only "that we have to work together, they always tell us how we are a family in the restaurant. And just that that's what I recall.").

On March 29, 2016, Austin spoke with Ivette Kaptzan, from Bonefish's corporate human resources department, and complained about the inappropriate touching and management's inadequate response. Pl. C.S. at ¶¶ 115-21. Kaptzan told Austin to deal with the work environment or quit. Id. at ¶122. She failed to inform him that the company had instructed

6

Rothery to train the staff regarding sexual harassment and had installed cameras to monitor the kitchen employees' behavior. Pl. C.S. at ¶¶ 122-27.

Austin resigned on March 29, 2016, due to the intolerable work environment. Pl. C.S., Def. C.S. at ¶ 128.

### III. Discussion

#### A. Sexual Harassment

Bonefish seeks summary judgment, arguing: (1) none of the allegedly harassing behavior was directed towards Austin; (2) none of the allegedly harassing behavior was "because of" Austin's sex; and (3) Austin's resignation was not a constructive discharge because Bonefish took appropriate steps to protect him from the alleged behavior, including installing cameras and conducting mandatory harassment classes. Def. Br. at 1.

An employer may not discriminate against an employee "because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). This provision is violated when an employer permits sexual harassment to create a hostile or abusive work environment. Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999) (citing Meritor Sav. Bank, 477 U.S. at 66). To prove sexual harassment caused a hostile work environment, Austin must show the harassment: (1) was based on his sex; (2) was severe or pervasive; (3) had an adverse impact; (4) would have affected a reasonable person in his position; and (5) can be attributed to his employer. Castleberry v. STI Group, 863 F.3d 259, 264 (3d Cir. 2017).

Federal law does not, however, establish "a general civility code." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998). Whether conduct is sufficiently "severe or pervasive" to constitute a hostile work environment depends on the "totality of the circumstances," Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993), including its frequency,

severity, whether it was physically threatening or humiliating or a mere "offensive utterance," and whether it interfered with an employee's work performance. Id. at 23.

Even if the harassment is sufficiently severe or pervasive to constitute a hostile work environment, Bonefish claims that Austin cannot prove it was "because of" his sex. Def. Br. at 4-9. There are three ways to prove sexual harassment was "because of sex" when the victim and perpetrator are the same sex; the plaintiff can show the harassment was: (1) motivated by sexual desire; (2) directed at only one sex or individuals of one sex who perform a particular function in the workplace; or (3) intended to convey the belief that the victim did not adequately conform to gender stereotypes. Bibby v. Philadelphia Coca Cola Bottling Co., 260 F.3d 257, 262-63 (3d Cir. 2001).

Austin contends that the actions were directed towards him and therefore support an inference that they were motivated by sexual desire. Pl. Br. at 19. His allegations, however, describe two different kinds of behavior before and after his complaints to management. The timing of the behaviors suggests the motivations behind each differ. According to Austin, the inappropriate touching and mimicking of sexual acts likely predated his tenure in the kitchen because he observed that behavior on his first day of work, albeit performed more "discreetly." Austin Dep. at 85. He does not suggest that, when he first began to work at Bonefish, the inappropriate behavior was motivated by his presence. According to Austin, the behavior became directed towards him only after he complained about it to Rothery. Id. at 112; see also James Dep. at 26.

Because the sexually explicit activity is alleged to have targeted Austin only after he complained in the summer of 2015, he cannot rely on its sexually explicit nature alone to support

an implication that it was "because of" his sex.[5] Moreover, Austin concedes that his colleagues' behavior "had nothing to do with anybody's sexual gender."[6] Austin Dep. at 118. Compare Sawa v. RDG-GCS Joint Ventures III, No. 15-6585, 2017 WL 3033996, at *9-11 (E.D. Pa. July 14, 2017) (denying summary judgment on sexual discrimination claim when sexually explicit messages were sent to men and women); Burley-Sullivan, 2001 WL 1175127, at *5 (denying summary judgment on sexual harassment claim based on sexually explicit statements made about plaintiff and her family).

Because Austin has failed to proffer any evidence to suggest he was subject to harassment "because of" his sex, his sex discrimination claim must be dismissed. See Betz v. Temple Health Systems, No. 15-727, 2015 WL 4713661, at *1-3 (E.D. Pa. Aug. 7, 2015) (dismissing hostile work environment claim that consisted of other employees "licking, groping, making gestures or pretending to grope each other's breasts and genitals . . . on a nearly daily basis" because there was no evidence the conduct took place only in plaintiff's presence).

B. Race Discrimination

Bonefish also argues Austin has failed to provide prima facie evidence of race discrimination. Def. Br. at 21-22.

An employer may not discriminate against an employee "because of . . . race." 42 U.S.C. § 2000e-2(a)(1). Racial discrimination can also be proven by demonstrating a hostile or abusive

---

[5] Unlike the plaintiffs in the cases he cites, Austin does not contend he was touched or that any of his colleagues mimicked sexual activity with him. Cf. Dick v. Phone Directories Co., Inc., 397 F.3d 1256, 1266 (10th Cir. 2005) (implicit proposal for sexual activity with plaintiff was sufficient to find conduct was motivated by sexual desire); Winters v. Florida Dept. of Corr., 203 F. Supp. 2d 1305, 1308 (M.D. Fla. 2001) (harasser touched plaintiff); Burley-Sullivan v. City of Philadelphia, No. 00-2413, 2001 WL 1175127 (E.D. Pa. Sept. 17, 2001) ("lewd" gossip concerned plaintiff and her family).

[6] Austin offers no evidence that the activity had any relationship to his professional role or failure to conform to gender stereotypes. See Bibby, 260 F.3d at 262-63.

9

work environment. Kunin, 175 F.3d at 293 (citing Meritor, 477 U.S. at 66); see also Amtrak v. Morgan, 536 U.S. 101, 116 n.10 (2002) ("hostile work environment claims based on racial harassment are reviewed under the same standards as those based on sexual harassment"). To prevail on this claim, Austin must show the harassment based on his race: (1) was severe or pervasive; (2) had an adverse impact; (3) would have affected a reasonable person in his position; (4) can be attributed to his employer; and (5) was targeted against him "because of" his race. Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001) (citing Faragher v. Boca Raton, 524 U.S. 775, 786–87 (1998)).

Austin claims he was harassed by kitchen staff because of his race, and contends that Bonefish allowed the staff to target him because of race. Pl. Br. at 27-28; Austin Dep. at 120. On the days he worked in the kitchen, Austin was with, at most, only one other African-American, who was also made uncomfortable by the other employees' inappropriate sexual activity. Austin Dep. at 119-20.

Austin also claims Rothery was racially biased, citing the James impersonation call incident, id. at 122-23, and the joke about interracial friendship, id. at 121. Finally, Austin complains that all his colleagues except James spoke Spanish, laughed at his inability to speak Spanish with them, and refused to speak English to him to facilitate their work, thereby undermining his job performance. Id. at 69-76.

As noted above, the inappropriate sexual activity amongst co-workers does not appear to have been racially motivated because it predated Austin's employment and targeted him only

10

after his complaints to management.[7]  Id. at 112.  Moreover, Austin fails to explain how the sexually suggestive behavior targeted him because he is African-American.

In terms of Austin's inability to communicate with his colleagues, English-speaker is not a protected class, and language is not interchangeable with race.  See Paradoa v. Philadelphia Housing Authority, No. 13-6012, 2014 WL 2476595, at *5 (E.D. Pa. June 2, 2014) (citing Hernandez v. New York, 500 U.S. 352, 353–54 (1991)).  Moreover, Austin admitted that, when he would complain about the language barrier, Rothery would instruct the kitchen staff to speak English to him.  Austin Dep. at 73.  Speaking English also was not a requirement for kitchen staff.  Kaptzan Dep. at 48.  Finally, there is no evidence that the work performance of the other similarly-situated employee, James, suffered, even though he also spoke only English and found his colleagues' Spanish-speaking "annoying."  James Dep. at 10-12.  James continued working at Bonefish for several months after Austin left and resigned only once he had secured a "better" job.  Id. at 6-7, 36.

The only evidence Austin relies on to show that the kitchen employees' behavior was motivated by race consists of isolated comments by Rothery, who was not involved in the harassment, and language issues that are distinct from race.  Austin lacks sufficient evidence that his co-workers' offensive behavior was "because of" his race.  Peace-Wickham v. Walls, 409 F. App'x 512, 520 n.1 (3d Cir. 2010) (citing Caver v. City of Trenton, 420 F.3d 243, 263 (3d Cir. 2005)); Noel v. Boeing Co., No. 06-2673, 2008 WL 1999757, at *21 (E.D. Pa. May 8, 2008),

---

[7] According to Austin, he and James were the only two African-American employees and James began working at Bonefish after him, so the behavior began before there was anyone of Austin's race to offend in the kitchen.  To show harassment was motivated by racial discrimination in addition to retaliation, a plaintiff must cite some evidence of the harasser's racial animus.  See Felder v. Penn Mfg. Indus., Inc., 303 F.R.D. 241, 243 (E.D. Pa. 2014) (denying summary judgment when Plaintiff was "silently harass[ed]" by a co-worker after complaining about the co-worker's other more explicitly racist behavior).

aff'd, 622 F.3d 266 (3d Cir. 2010), (finding evidence that "Plaintiff was disliked and at times intentionally treated poorly and unprofessionally" insufficient to establish "the kind of severe, pervasive *racial* discrimination that is necessary") (emphasis in original).

Austin's race discrimination claim is dismissed.

### C. Retaliation

An employer is precluded from retaliating against an employee who has alleged an unlawful employment practice. 42 U.S.C. § 2000e-3(a). To prove retaliation, a plaintiff must show: (1) a protected activity, (2) an adverse employment action, and (3) a causal link between them. Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006). Making a good faith complaint about sexual or racial discrimination constitutes protected activity for the purposes of a retaliation claim, id. at 341, even if the complaint would not have supported a Title VII action, id. at 342, and even if it was only an "informal" complaint, Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 193 (3d Cir. 2015).

A reasonable jury could conclude that Austin complained to Rothery in the summer of 2015 about behavior that he reasonably believed constituted sex and race discrimination. Austin Dep. at 115; James Dep. at 25, 37. There is also sufficient evidence for a reasonable jury to conclude that Austin complained again, in writing, in September 2015, and subsequently in multiple verbal complaints to Rothery and other managers. See Ex. 20 to Plaintiff's Response; Austin Dep. at 108, 161-63. Those complaints constitute protected activity. Moore, 461 F.3d at 341.

Austin claims he suffered two adverse employment actions: (1) the exacerbation of the hostile work environment after his complaints; and (2) constructive discharge after McMann and Kaptzen refused to address the behavior. Pl. Br. at 25. For a hostile work environment to

constitute an adverse employment action, it must be "pervasive or severe." Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). To prove constructive discharge based on a hostile work environment, Austin must show that his working conditions were "so intolerable [that an objectively] reasonable person would have felt compelled to resign." Pennsylvania State Police v. Suders, 542 U.S. 129, 147 (2004); see also Mandel v. M & Q Packaging Corp., 706 F.3d 157, 169-70 (3d Cir. 2013) ("[A]n employee's subjective perceptions of unfairness or harshness do not govern a claim of constructive discharge.").

Considering the "totality of the circumstances," a reasonable jury could find Austin's post-complaint work environment sufficiently "severe or pervasive." Harris, 510 U.S. at 23. The sexually inappropriate touching and simulated sexual activity were pervasive because they occurred daily after Austin's summer 2015 complaint to Rothery. Austin Dep. at 99; see also Resetar v. Phillips Feed Serv., Inc., No. 16-3428, 2017 WL 1092345, at *4 (E.D. Pa. Mar. 23, 2017) (finding daily "frequency is probative of severity and pervasiveness").

The post-complaint behavior Austin described could be interpreted as physically threatening, and was designed at least to humiliate him. See Harris, 510 U.S. at 23. Although Austin concedes the other employees never touched him or simulated sexual activity with him, they did stare and smile at him while reaching into one another's pants. Austin Dep. at 108. Austin was targeted only after his co-workers learned that he complained to management about their behavior. Id. Therefore, the behavior carried an implicit message that Austin was being harassed in retaliation for his complaints. See Gelorme v. Ferraccio Family Markets of Pennsylvania, Inc., No. 12-1340, 2013 WL 6185167, at *3 (noting that an incident in which one

13

man smiled at another while simulating masturbation could support a hostile work environment claim if "such conduct had been part of a pattern").

A reasonable jury could also conclude the harassment affected Austin's ability to perform his job. Austin testified that the continued harassment left him visibly stressed, causing Wright to repeatedly ask him what was wrong before he confided to her about the harassment he was experiencing. Austin Dep. at 161. Austin also testified that, on March 19, 2016, his performance was so affected that Rothery told him "to get engaged or go home." Austin Dep. at 165. The following day, Austin was still too upset to work, and at that point he complained directly to McMann. Id.

Because the harassment was pervasive, designed to humiliate and/or threaten, and affected Austin's work performance, Harris, 510 U.S. at 23, a reasonable jury could find it was sufficiently severe or pervasive to create a hostile work environment. Cardenas v. Massey, 269 F.3d 251, 261-63 (3d Cir. 2001) (overturning summary judgment against plaintiff who "may not have presented as much evidence as did plaintiffs in other hostile workplace environment cases" because isolated disparaging remarks could allow a jury to find facially neutral activity discriminatory).

To hold Bonefish liable for the kitchen workers' behavior, Austin also must show "management knew or should have known about the harassment but failed to take prompt and adequate remedial action." Jensen, 435 F.3d at 453 (citing Andrews, 895 F.2d at 1486). Management will be protected from liability if the remedial measures taken were "reasonably calculated to end the harassment," even if the harassment continued. Id.

According to Austin, Rothery's only response to his repeated complaints was to speak informally with the kitchen staff, and the other managers took no action whatsoever. Austin

14

Dep. at 162, 256. Knowing of the harassment Austin endured, Rothery told Austin to "get engaged or go home." Pl. C.S. ¶ 81. Even when Wright allegedly met with the employees to instruct them to stop in a more formal setting, the subject of harassment was not discussed. Rivera Dep. at 8-9; Reyes Dep. at 7. Neither McMann nor Kaptzen ever told Austin cameras had been installed to monitor the kitchen workers' behavior, and even after he investigated Austin's claims and several co-workers admitted their behavior, McMann told Austin he had to deal with the behavior or quit. Pl. C.S. ¶109, 123-27; Austin Dep. at 172. Kaptzen reiterated Austin's only two choices: adjust or quit. Pl. C.S. ¶122. A reasonable jury could find that Bonefish failed to take measures reasonably calculated to end the harassment.

Defendant's motion is therefore denied as to Count III, Retaliation.

An appropriate order follows.